In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1104

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NICOLAS GOMEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10-CR-1055—**William J. Hibbler**, *Judge.*

ARGUED JANUARY 16, 2013—DECIDED APRIL 5, 2013

Before BAUER and HAMILTON, *Circuit Judge*s, and
MILLER, *District Judge.**

MILLER, *District Judge.* A jury found Nicolas Gomez
guilty of four drug-related crimes following a five-day
jury trial. Mr. Gomez was sentenced to four concurrent
84-month terms. Mr. Gomez contends that the district

---

* The Honorable Robert L. Miller, Jr. of the Northern District
of Indiana, sitting by designation.

court erred in admitting evidence of his possession of cocaine a few weeks after the charged crimes, and that the district judge didn't specify his perjurious statements when increasing his sentencing range for obstruction of justice. We affirm the conviction and sentence. While the admission of the uncharged cocaine possession was questionable, it was not an abuse of discretion. We also hold that given the context of the statements, the district court made a sufficient record.

I

This investigation was based largely upon interception of telephone communications between Roberto Romero and a male referred to as "Guero." The government believes Guero was Mr. Gomez. Two dates are important for today's discussion; additional facts are set forth as needed. On September 3, 2010, two agents stopped and spoke with Mr. Gomez immediately after seeing Mr. Gomez speaking with Roberto Romero. Mr. Romero was thought to be Mr. Gomez's supplier and would become Mr. Gomez's co-defendant. Later in the day, agents searched a car and found a quarter kilogram of cocaine. The car Mr. Romero had driven from Chicago to Milwaukee was eventually searched by agents.

Twenty-six days later, agents arrested Mr. Gomez at his home and searched the residence pursuant to a search warrant. The agents found a personal use quantity of cocaine in the pocket of a pair of pants found in a bedroom connected with Mr. Gomez. The district court denied Mr. Gomez's pretrial motion to suppress evidence

of the search and its fruits. The admission of that cocaine into evidence at trial gives rise to the first issue presented in this appeal.

The government moved for a pretrial determination of the admissibility of the September 29 cocaine evidence. The government conceded that the admissibility of the cocaine depended on what Mr. Gomez argued at trial, but the evidence would be admissible if Mr. Gomez argued that he lacked knowledge, he wasn't the person involved in the conspiracy, or that this was all just an accident or mistake. Mr. Gomez argued that the evidence at issue wouldn't be relevant under any circumstances because he was charged with conspiracy rather than possession, and the September 29 events happened after the charged conspiracy. The court denied the government's request, explaining that while the sequence of events didn't defeat admissibility, additional information was needed to connect Mr. Gomez to the cocaine found on the day of the arrest.

The government renewed its motion to admit the cocaine evidence under Rule 404(b) at trial. The government argued that Mr. Gomez had "opened the door through [his] opening statement and cross-examinations of two witnesses regarding [his] not possessing or touching cocaine, implying that [he] was just an innocent bystander at the wrong place at the wrong time." Gov't Br., at 14. In support of its position, the government noted that: Mr. Gomez's counsel had established, through the agent who conducted a patdown of Mr. Gomez on the street some weeks prior to his arrest,

that the agent hadn't found cocaine, cocaine paraphernalia, or large amounts of cash on Mr. Gomez; Mr. Gomez's counsel had established, through cross-examination of an agent who conducted surveillance of Mr. Gomez, that the agent saw no hand-to-hand transactions or Mr. Gomez with cocaine; and that Mr. Gomez's counsel told the jury in opening statement that it wouldn't see any evidence about Mr. Gomez having cocaine on him during the period of the charged conspiracy. The government told the court it wanted to respond to the implication that Mr. Gomez was "basically the unluckiest man in the world," in the wrong place at the wrong time. Mr. Gomez objected to the government's renewed request, arguing that no door had been opened and nothing had happened since the pretrial denial of the government's request to make the evidence admissible.

The court ruled that while Mr. Gomez might have opened the door to evidence correcting a misimpression, too little evidence connected Mr. Gomez to the cocaine found on the day of the arrest:

> The implication of [defense counsel's] questioning was not simply, [Mr. Gomez] does not have drugs on him now. The implication of [defense counsel's] questioning was, [Mr. Gomez] is not at all associated with drugs. And I think that inference is what [defense counsel] wanted to get to the jury. [Mr. Gomez] is an individual who is pure as the new fallen snow. And they are putting all of the things on him, for whatever reason, I don't know. But that was the implication.

And the court is not ruling that they can do that because the court has not heard the evidence as to what they would expect to be able to — how they are going to establish that when [Mr. Gomez] was in the room, whether or not they were his pants, etc. etc. etc.

So we will do that outside the presence of the jury. But I am just saying that there have been questions that you have asked, which were proper questions. But they open the opportunity, maybe, for some response to [those] issues.

Tr. at 379.

Several witnesses later, the government renewed its request to admit the Rule 404(b) evidence, arguing that it had established that the address where the cocaine was found on the day of the arrest was Mr. Gomez's residence and the bedroom at issue was Mr. Gomez's bedroom. Mr. Gomez again objected, first, because the evidence was insufficient to support a finding that he committed a similar act; second, because numerous people lived in that house so the bedroom could have belonged to anyone; and, third, because the bedroom contained "quite a bit of clutter," it wasn't clear where the jeans were found or if he owned them. In reply, the government specified that the later cocaine evidence was offered on the issues of identity and absence of mistake, rather than as propensity evidence. Mr. Gomez's counsel rejoined that it was propensity evidence and that there was too little evidence to support a finding that Mr. Gomez committed the subsequent act.

This time, the court agreed with the government and admitted the evidence on the issues of identity, knowledge, and absence of mistake or accident. The jury heard the evidence and was told in the final instructions that it could only consider the September 29 evidence "on the question of identity, absence of mistake or accident, and knowledge."

## A

Mr. Gomez claims the admission of evidence of his subsequent possession of a user amount of cocaine as Rule 404(b) evidence was an abuse of discretion as the admission of that evidence fails each prong of the Rule 404(b) test.

"We review a district court's admission of evidence for an abuse of discretion [and] will reverse an evidentiary ruling only when the record contains no evidence on which the district court rationally could have based its ruling." *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010). "We give special deference to the trial judge regarding these matters because of his first-hand exposure to witnesses, familiarity with the case, and ability to gauge the impact of the evidence in the context of the entire proceeding. Only where no reasonable person could take the view adopted by the trial court will we reverse an evidentiary ruling." *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008) (citation omitted); *accord United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011).

When Mr. Gomez was tried in September 2011, Federal Rule of Evidence 404(b) provided that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." For the evidence to be admissible, the non-propensity probative value of the evidence must be sufficient so as not to be substantially outweighed by the risk that the jury will use the evidence as proof of an improper character inference. FED. R. EVID. 403; *United States v. Ciesiolka*, 614 F.3d 347, 355-56 (7th Cir. 2010).

A court deciding whether to admit evidence under Rule 404(b) considers whether "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, as required by Rule 403." *United States v. Albiola*, 624 F.3d 431, 439 (7th Cir. 2010); *accord United States v. Boling*, 648 F.3d 474, 479 (7th Cir. 2011).

Mr. Gomez contends that none of these factors supported admission of the September 29 evidence.

B

The first consideration is whether the evidence was directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged. Mr. Gomez points to the district court's infelicitous comment when discussing the government's first in-trial offer of the September 29 evidence:

> The implication of [defense counsel's] questioning was not simply, [Mr. Gomez] does not have drugs on him now. The implication of [defense counsel's] questioning was, [Mr. Gomez] is not at all associated with drugs. And I think *that inference is what [defense counsel] wanted to get to the jury. [Mr. Gomez] is an individual who is pure as the new fallen snow.* And they are putting all of the things on him, for whatever reason, I don't know. But that was the implication.

Tr. at 379 (emphasis added). At that point in the proceedings, the government sought admission on the theory that by focusing on the lack of eyewitness testimony that Mr. Gomez had possessed cocaine during the time of this conspiracy, the defense had opened the door to evidence that he possessed cocaine shortly after the conspiracy's expiration.

Had the district court admitted the evidence at that point, it would have been error. The principle of "door opening" "depends on the specific situation in which it is used and thus calls for an exercise of judicial discretion." *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011). A defendant's opening statement might increase the probative value of proof of other acts, *see, e.g., United*

*States v. Dennis*, 497 F.3d 765, 768 (7th Cir. 2007), but the Rule 404(b) evidence must respond to what is said to trigger admissibility. *Villegas*, 655 F.3d at 672. Nothing about Mr. Gomez's defense had opened the door to his possession of cocaine in a time outside the conspiracy, any more than challenging evidence that a defendant robbed a bank on one day opens the door to evidence that he had robbed a bank on another day.

But the evidence wasn't admitted at that point in the trial. The court refused to admit it because too little evidence tied the post-conspiracy cocaine to Mr. Gomez. By the time the government offered the September 29 evidence again, the government specified that it was offering the evidence to prove identity, knowledge, and absence of mistake. The government said nothing about rebutting the opening statement or Mr. Gomez's cross-examination of two agents — nothing about Mr. Gomez having opened the door. The trial court admitted the evidence and eventually told the jury the evidence was admitted on the issues of identity, knowledge, and absence of mistake.

Whatever theory of admissibility might have been discussed earlier in the trial, the September 29 evidence ultimately was admitted for the non-propensity purposes of identity, knowledge, and absence of mistake. The government satisfied the first prong of the test for admissibility.

C

The second prong of the test for admissibility is whether the evidence is similar enough and close enough in time to be relevant to the non-propensity matter in issue on which it is offered — in other words, whether it is probative of identity or absence of mistake. Mr. Gomez argues that the September 29 evidence was not relevant to either point.

1

Mr. Gomez is correct with respect to absence of mistake. Rule 404(b), at the time of trial and now, specifies absence of mistake as an illustrative example of the non-propensity purposes for which evidence of a defendant's act on another occasion is permissible. Evidence offered for that purpose almost invariably goes to whether the defendant was mistaken, not to whether investigators were mistaken. *See, e.g., United States v. Albiola*, 624 F.3d 431, 439 (7th Cir. 2010); *United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004). One trial's facts invariably differ from the one before, so it would be wrong to say uncharged misconduct evidence never could be admissible to prove an absence of mistake on the investigators' behalf. But Mr. Gomez's case shows why such a case would be an outlier.

Mr. Gomez's primary defense at trial was that the investigators were mistaken as to whose voice they recorded conspiring with Roberto Romero. Mr. Gomez pointed out that others (such as Victor Reyes) lived in

the residence from which calls were made and received, and, as already noted, Mr. Gomez pointed out the lack of any eyewitness testimony to his participation. The investigators, he implied, were mistaken. The government's September 29 evidence rebutted that implication only by showing precisely what Rule 404(b) forbids: that Mr. Gomez has a propensity toward involvement with cocaine, making it less probable that the investigators were mistaken. *See United States v. Webb*, 548 F.3d 547, 548 (7th Cir. 2008) ("As for 'absence of mistake': how does a conviction show this *except* via the prohibited inference that someone who distributes drugs once is likely to do it again?") (emphasis in original). Absence of mistake was not, under the circumstances of this case, a non-propensity purpose for the September 29 evidence.

2

Nor can we perceive a series of non-propensity inferences that would make Mr. Gomez's later possession of cocaine relevant to his knowledge during the conspiracy. The government did little more, at trial and before this court, than mention "knowledge" as one purpose for which the September 29 evidence was offered. Mere passing reference isn't enough. "To differentiate between 'the illegitimate use of a prior conviction to show propensity and the proper use of a prior conviction to prove intent,' 'the government must affirmatively show why a particular prior conviction tends to show the more forward-looking fact of purpose, design, or volition to

commit the new crime.'" *United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012) (quoting *United States v. Jones*, 389 F.3d 753, 757-58 (7th Cir. 2004)).

3

Mr. Gomez contends the government's showing was insufficient to prove identity. He argues that uncharged acts can prove identity only through a showing of the defendant's distinctive manner of operation, or *modus operandi*. *United States v. Simpson*, 479 F.3d 492, 498 (7th Cir. 2007). He also argues that his possession of cocaine twenty-six days after the discovery of the cocaine in Mr. Romero's car is too remote to be proof of anything.

Mr. Gomez overstates the relationship of *modus operandi* and other methods of proving a criminal actor's identity. *Modus operandi* — a criminal's particular way of committing a crime — is a common way of proving a perpetrator's identity; it requires no inference of character or propensity to say that because this person commits crimes in the same peculiar way the charged crime was committed, proof of another act to show the person's peculiar approach doesn't enlist any inference about the person's propensity to commit the crime in the first place. *See, e.g, United States v. Anifowoshe*, 307 F.3d 643, 647 (7th Cir. 2002). But *modus operandi* isn't the only way evidence of conduct on another occasion can be relevant to identity without relying on an inference of character or propensity. *See United States v. Simpson*, 479 F.3d 472, 497-98 (7th Cir. 2007) (explaining

difference between *modus operandi* and other methods of proving identity through uncharged conduct).

Mr. Gomez argues that September 29 was too remote from the conspiracy's time frame to be relevant. Mr. Gomez describes the separation as "weeks," while the government points to *United States v. Dennis*, 497 F.3d 765, 768-69 (7th Cir. 2007), in which events that occurred six months before the charged crime were considered close enough in time to be relevant. Simply defining the time period or citing cases that involved greater time periods does not reach the heart of the remoteness aspect of the relevancy prong. A court considering admission of evidence governed by Rule 404(b) must ask whether, under the specific facts of the case and the string of inferences on which the proponent of the evidence relies, the uncharged conduct is close enough in time to be relevant. *See, e.g., United States v. Chapman*, 692 F.3d 822, 827 (7th Cir. 2012); *United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006); *United States v. Chavis*, 429 F.3d 662, 669-70 (7th Cir. 2005). Under the facts of this case, if Mr. Gomez's later possession of cocaine is relevant to the identity of the person on the recorded calls, twenty-six days is not so remote as to reduce that relevancy.

A defendant's prior or subsequent possession of cocaine isn't always admissible when identity is at issue in a drug case. *United States v. Brown*, 471 F.3d 802, 806 (7th Cir. 2006). To satisfy this prong of the Rule 404(b) test, the uncharged act evidence must make it more probable that the defendant was the actor in the charged crime.

More specifically, Mr. Gomez's possession of cocaine on September 29 must make it more probable that Mr. Gomez was the person involved in the drug conspiracy (and captured on the monitored phone calls) with Mr. Romero.

That anyone in Milwaukee possessed cocaine on September 29, 2010 tells a juror nothing about whether Nicolas Gomez was involved in a large cocaine distribution operation with Roberto Romero earlier in 2010. That it was Nicolas Gomez who possessed the cocaine on September 29 adds nothing to its probative value, unless the juror reasons that the September 29 possession shows that Mr. Gomez has a propensity toward involvement with cocaine — but that is the inference Rule 404(b) forbids. Agents questioned Mr. Gomez near the time and place Mr. Romero's abandoned car was found with a quarter kilogram of cocaine, but six other people were nearby at the same time, and this all occurred near Mr. Gomez's residence.

The government notes, though, that the cocaine was found in Mr. Gomez's room in a house associated with one of the phones involved in the sixty-one recorded phone calls in which someone arranged cocaine deliveries with Mr. Romero. And the cocaine was found in Mr. Gomez's room in that house less than four weeks after the aborted delivery by Mr. Romero. These additional facts, the government argues, make it more probable that Mr. Gomez was the person whose voice was on those recorded calls. In support of its argument, the government cites *United States v. Brown*, 471 F.3d

802, 806 (7th Cir. 2006), in which the defendant claimed he had never had any dealings with a confederate named Veal, "who must have picked [Brown's] name out of a hat." Under those circumstances, the government's evidence that Brown had been dealing with Veal for years was relevant to prove Brown's identity as the person with whom Veal dealt. *See also United States v. Gibson,* 170 F.3d 673, 679 (7th Cir. 1999) ("This evidence helped establish that Agent Banks dealt with Gibson, not his brother, in the charged 1996 drug transactions even though Gibson did not confess to the specific under-cover sales in this case.").

The inference on which the government relies in this case is less compelling than that in *Brown*; the later possession of cocaine discloses no relationship between Mr. Gomez and Mr. Romero. Still, evidence is relevant if it has any tendency to a make a fact of consequence in determining the action more or less probable than it would be without the evidence, FED. R. EVID. 401, and the September 29 evidence has some tendency to make it more probable that Mr. Gomez, a person living in a house associated with one of the phones on which drug deliveries were arranged, was the person recorded in conversation with Mr. Romero. *See United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) ("A party faces a significant obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant. We have recently asserted that '[t]he Federal Rules of Evidence do not

limit the government to the 'most' probative evidence; all relevant evidence is admissible and the Rules define relevance broadly.' ") (quoting *United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011)). Assessing the extent of that tendency is a matter for the fourth prong of the analysis. *See United States v. Beck*, 625 F.3d 410, 417 (7th Cir. 2010) ("While evidence of Beck's probation could be admitted to establish his identity, under Rule 404(b), the judge still has to weigh its appropriateness under Rule 403.").

D

Admissibility under Rule 404(b) requires enough evidence to support a jury finding that the defendant committed the other act. *United States v. Albiola*, 624 F.3d at 439. Mr. Gomez complains that the evidence of his occupancy of the bedroom was ambiguous. Documents found in the bedroom identified Victor Reyes; Mr. Reyes had identification showing he lived in the house; and Mr. Reyes had associated the house with phones in his name. Further, Mr. Gomez notes, the agents' testimony disagreed as to whether the cocaine was found in a jacket or a pair of jeans, and the chemist's analysis of the substance was (as Mr. Gomez saw it) less than convincing.

Mr. Gomez demands greater certainty than does Rule 404(b). Proof that would allow a factfinder to connect the uncharged act with the defendant is no small burden, but the Rule requires no more than that.

*See United States v. Burke*, 425 F.3d 400, 410 (7th Cir. 2005). The district court declined to admit the September 29 evidence until the government laid this foundation. Ultimately, the evidence showed that Mr. Gomez came out of the room at 6:00 a.m. when the agents executed the warrant, and several documents addressed to Mr. Gomez were found there. From that, a reasonable juror could infer that the bedroom contained Mr. Gomez's belongings. The additional facts to which Mr. Gomez points would allow a different finding, but don't foreclose a finding that Mr. Gomez was the person who possessed the cocaine on September 29.

The government satisfied the third prong of the four-part test.

E

Finally, admission is improper if the risk of unfair prejudice from admission of the uncharged act evidence substantially outweighs its probative non-propensity value. The most common risk of unfair prejudice is that the jury will draw the forbidden propensity inference — that the defendant is the sort of person who does what he's charged with — and Mr. Gomez identifies no other risk. Admission of the September 29 evidence was improper, then, if the risk that the jury would draw the forbidden propensity inference substantially outweighed the probative value of the evidence as proof of the identity of the person who discussed cocaine deliveries on phones associated with the house in which the cocaine was found on September 29.

As already noted, the string of inferences on which the government relies to get from Mr. Gomez's possession of cocaine on September 29 to Mr. Gomez's involvement in this cocaine conspiracy is not particularly compelling. Balancing the risk of unfair prejudice against probative value is done on a sliding scale: the lower the probative value, the lower the tolerance of the risk of prejudice. *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012). Other judges, including members of this panel, might well have decided that the risk that the evidence would be used as proof of propensity substantially outweighed the probative value in that string of inferences. Today's issue, though, isn't admissibility; it is whether the district court abused its discretion in admitting the evidence. *United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011) ("although we might have ruled differently, the district judge did not abuse her discretion"); *accord United States v. Ozuna*, 674 F.3d 677, 681 (7th Cir. 2012) ("The district court's decision to admit evidence is reviewed for abuse of discretion, given the judge's position to assess the impact of the evidence in the context of the trial witnesses and evidence as a whole."). The district court did not abuse its discretion.

First, the district court instructed the jury on the limited use to which the September 29 evidence could be put. We assume juries ordinarily follow limiting instructions, *United States v. Sanchez*, 615 F.3d 836, 842 (7th Cir. 2010), so that instruction reduces the risk that the jury would consider the September 29 evidence as proof of Mr. Gomez's propensity to be involved with drugs. *Cf. United States v. Simpson*, 479 F.3d 492, 500 (7th Cir.

2007) ("[T]he jurors did not receive a relevant limiting instruction, which can minimize prejudice from the introduction of Rule 404(b) evidence.").

Second, a district judge abuses her discretion only if no reasonable judge would agree with the ruling. *Smith v. Hunt*, 707 F.3d 803, 807-08 (7th Cir. 2013); *United States v. Chapman*, 692 F.3d 822, 827 (7th Cir. 2012); *United States v. Reese,* 666 F.3d 1007, 1015 (7th Cir. 2012). Those who challenge the district judge's evidentiary rulings "are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle." *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000) (quoting *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir. 1999)). And we have often said that we give Rule 403 balancing decisions even wider berth. *United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012) ("we give 'special deference' to the court's findings under Rule 403"); *United States v. Hosseini*, 679 F.3d 544, 556 (7th Cir. 2012) ("We give special deference to the district court's assessment of the balance between probative value and prejudice because that court is in the best position to make such assessments.") (quoting *United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006)); *Common v. City of Chicago*, 661 F.3d 940, 946 (7th Cir. 2011) (same).

We cannot say that admission of the September 29 evidence was an abuse of discretion under these standards. The government articulated a reasonable, if a bit wobbly, theory of relevance to a non-propensity matter central to the prosecution and defense. The government presented enough evidence that a factfinder

could decide the cocaine found on September 29 belonged to Mr. Gomez. Evidence that would support an additional inference that Mr. Gomez was a conspirator was especially important in light of Mr. Gomez's theory of defense. The district court listened to eloquent argument from Mr. Gomez's counsel concerning the risk of unfair prejudice, but ultimately disagreed, admitted the evidence, and gave a limiting instruction to reduce that risk.

## F

Today's decision is no retreat from what we said last year in *United States v. Miller*, 673 F.3d 688 (7th Cir. 2012):

> To differentiate between 'the illegitimate use of a prior conviction to show propensity and the proper use of a prior conviction to prove intent,' 'the government must affirmatively show why a particular prior conviction tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime.' . . . Confusion and misuse of Rule 404(b) can be avoided by asking the prosecutor exactly how the proffered evidence should work in the mind of a juror to establish the fact the government claims to be trying to prove.

673 F.3d at 699 (quoting *United States v. Jones*, 389 F.3d 753, 757-58 (7th Cir. 2004)). The same reasoning applies regardless of whether the uncharged conduct resulted in a conviction, regardless of whether it was the uncharged act or the charged act that happened first, and regardless of the stated non-propensity purpose.

Nor do we retreat at all from what we said in *United States v. Albiola*, 624 F.3d 431, 438 (7th Cir. 2010):

> Because of our general concerns about the prejudicial nature of this type of evidence, we have emphasized that 'there must be a principled exercise of discretion. The district judge must both identify the exception that applies to the evidence in question and evaluate whether the evidence, although relevant and within the exception, is sufficiently probative to make tolerable the risk that jurors will act on the basis of emotion or an inference via the blackening of the defendant's character.' *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir. 1987). Our recent precedent indicates that a court's failure to consider the implications of Rule 404(b) evidence before admitting it may be grounds for reversal.

Analyses such as those set forth in *Miller* and *Albiola* improve the quality of rulings in the district courts and facilitate review in this court. It is what district courts should do; had the district court done so with respect to the September 29 evidence, our analysis could have been briefer.

Still, this case is not *Miller*, in which the district court didn't conduct the Rule 403 balancing test at all and found probative value in the "pattern" established by a drug crime that the defendant committed eight years earlier. Mr. Gomez's uncharged conduct involved the same drug, the same house, and the same calendar month. A reasonable judge could find that the risk of a propensity inference didn't substantially outweigh the non-propensity probative value.

Nor is this case *Albiola*. Mr. Gomez does not claim the district judge ignored the implications of the September 29 evidence; he simply contends the judge got it wrong. "Although the district court might have better explained the rationale behind its Rule 403 conclusion, it is evident to us that the court's ultimate reason for admitting the evidence was that the probative value was not significantly outweighed by the prejudicial impact." *United States v. Gorman*, 613 F.3d 711, 720 (7th Cir. 2010).

II

Mr. Gomez argues that the district court erred in calculating the range recommended by the sentencing guidelines. The district judge increased Mr. Gomez's offense level by two levels for attempted obstruction of justice. U.S.S.G. § 3C1.1. Mr. Gomez contends that was error.

A

The enhancement springs from Mr. Gomez's motion to suppress statements he made to DEA agents on September 3, 2010. The agents asked Mr. Gomez his name, address, and telephone number, and he provided that information to them. Mr. Gomez didn't testify at the suppression hearing, but relied on his affidavit in which he swore that the agents stopped him by blocking his path with their vehicle as he walked near his home a bit after noon. Mr. Gomez said one of the agents got out of the car and pointed a gun at him, telling him "don't move," leaving Mr. Gomez with the

belief that he was not free to leave or resist the agent's commands. Mr. Gomez stated, "under penalty of perjury," that the agents searched his wallet, removed his identification, and commanded him to verify the information on the identification and give them his telephone number. Mr. Gomez said the agents then left the scene. The two agents testified at the hearing; their testimony was at odds with Mr. Gomez's affidavit statement.

At the close of the hearing, the court denied the suppression motion. The judge found that the agents had used a ruse to stop Mr. Gomez, but there was nothing improper about their doing so. Special Agents Charles Amell and Enrique Carlton testified at the hearing about their encounter with Mr. Gomez, and at the end of the hearing the judge found that the officers had not arrested Mr. Gomez. The judge credited the officers' testimony that they had not blocked Mr. Gomez's path with their car and hadn't drawn any weapons. Instead, they had employed a ruse, which was permissible, and had a brief, consensual encounter with Mr. Gomez in which they collected Mr. Gomez's name, address, and phone number. The phone number Mr. Gomez gave the agents was one of the numbers used during the conspiracy.

At the sentencing hearing, Mr. Gomez's attorney objected to any enhancement for attempted obstruction of justice, arguing that Mr. Gomez had given his affidavit nearly a year after the encounter it described, that conflicting testimony doesn't always show that someone is committing perjury, and that the law shouldn't punish a defendant for using the opportunity to testify.

In response, the government argued that Mr. Gomez's affidavit was not based on a faulty memory, but, rather, was designed to prevent the government from using the phone number to tie him to the conspiracy recordings.

The court overruled the objection and applied the two-level enhancement, explaining:

> The court finds that based upon the attempt to remove himself from the participation in this offense, the defendant did present a false affidavit with an attempt to escape responsibility for his actions. The court finds that the obstruction of justice enhancement is proper and allowable and would deny the defense motion to modify the court's determination that the enhancement is proper and would find that the government has sustained its burden of explaining to the court and the evidence satisfied the court that there was an attempt by the defendant to escape responsibility for his conduct by this false affidavit.

Sent. Tr. at 16.

B

The government and Mr. Gomez appear to agree that perjury at a suppression hearing amounts to attempted obstruction of justice within the meaning of U.S.S.G. § 3C1.1. Mr. Gomez complains that the district court's comments were insufficient to amount to a finding of perjury.

"A defendant commits perjury 'if she gives false testimony concerning a material matter with the willful

intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). "A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed. The statement need not *actually* affect the decision." *Grigsby*, 692 F.3d at 785 (emphasis in original; quotation and citation omitted). "For an obstruction of justice enhancement to apply, the government must establish by a preponderance of the evidence that the defendant had the specific intent to obstruct justice." *United States v. Nurek*, 578 F.3d 618, 623 (7th Cir. 2009). "A defendant's deliberate attempt to mislead the court implicates the basic purpose of the obstruction enhancement, whether it occurs during a plea hearing, at trial, or at some other point in the criminal process." *Grigsby*, 692 F.3d at 785.

Mr. Gomez contends that the district court did not identify the statement on which the obstruction finding was based or explain its materiality. Mr. Gomez doesn't dispute the government's contention that since the only issue Mr. Gomez raised at the sentencing hearing was willfulness, this court reviews the sufficiency of the findings with respect to the other elements of perjury under a plain error standard. *United States v. Galbraith*, 200 F.3d 1006, 1013 (7th Cir. 2010).

This record allows no room for doubt about which statements the sentencing judge had in mind. At the

sentencing hearing, the government identified two false statements in Mr. Gomez's affidavit: (1) that the agents pulled their vehicle onto the sidewalk where Mr. Gomez was walking to block his path, and (2) one agent pulled a weapon and pointed it at Mr. Gomez. At the suppression hearing, the court explicitly found those statements were false: "[T]he court finds specifically that the officers' testimony was compelling that they did not use their vehicle to block his path, they did not have their weapons drawn." Supp. Tr. at 76. The government also explained at the sentencing hearing how those affidavits statements were material: the telephone number that would have been suppressed was one of the numbers Mr. Gomez used during the period of the conspiracy and was intercepted over the wiretaps.

"[T]o impose the obstruction enhancement, the district court must make independent findings necessary to establish all of the three factual predicates for a finding of perjury (false testimony, materiality, and willful intent). . . . If the court fails to address each element clearly, the enhancement will withstand scrutiny if the court makes a finding that encompasses all of the factual predicates for the finding of perjury." *United States v. Savage*, 505 F.3d 754, 763 (7th Cir. 2007) (quotation and citation omitted).

The court found at the sentencing hearing that Mr. Gomez had tendered a false affidavit in an attempt "to remove himself from participation in this offense" and "to escape responsibility for his actions." Sent. Tr. at 16. The court also found that the government had

"sustained its burden" of pointing to evidence establishing that Mr. Gomez's submission of the false affidavit supported an obstruction of justice enhancement. Sent. Tr. at 16. "When read in context and in their entirety, the court's remarks on the application for the obstruction enhancement contain an implicit finding that [Mr. Gomez] intended to obstruct the prosecution. That is enough to sustain the two-level enhancement." *United States v. Nurek*, 578 F.3d 618, 624 (7th Cir. 2009); *see also United States v. Savage*, 505 F.3d 754, 764 (7th Cir. 2007) ("The lack of more precise findings on the enhancement does not warrant remand for resentencing.").

The district court's conclusion that Mr. Gomez's affidavit statements were false and were intended to affect the outcome of the case wasn't clearly erroneous, and Mr. Gomez hasn't shown any error that affected his substantial rights or seriously affected the fairness or integrity of the proceedings. *United States v. Robinson*, 663 F.3d 265, 268 (7th Cir. 2011).

III

The district court didn't abuse its discretion in admitting the September 29 evidence under Rule 404(b) and didn't commit plain error in enhancing Mr. Gomez's offense level for attempted obstruction of justice. We affirm Mr. Gomez's conviction and his sentence.

AFFIRMED.

HAMILTON, *Circuit Judge.* I respectfully dissent. The entire panel agrees that two of the three grounds the district court relied upon to admit the Rule 404(b) evidence are without merit. The remaining ground offered to support its admission was so weak that we can no longer say that admission was a sound exercise of discretion. The majority states the applicable law correctly in general terms, but under Rule 404(b), the nub of the matter lies in specific applications. I would reverse and remand for a new trial.[1]

Defendant Gomez was charged with participating in a five-month-long conspiracy to distribute several kilograms of cocaine, with deliveries of roughly 250 to 500 grams each. The deliveries went from Chicago to a Milwaukee residence that Gomez and several other people shared. The government's evidence from telephone intercepts provided strong evidence against whoever was speaking on the telephone as "Guero." The question is who was Guero? The government's theory is that Gomez was Guero, while Gomez maintains that Guero was probably Victor Reyes — a man who also lived at the Milwaukee residence.

To help show that Gomez was the one involved in the conspiracy, the government offered the Rule 404(b) evidence: that just 14 grams of cocaine were in a clothes

---

[1] Although I would reverse the convictions and remand for a new trial, I agree with the majority that the district court did not make a plain error by imposing the enhancement for obstruction of justice in calculating the applicable Sentencing Guidelines.

pocket in Gomez's bedroom nearly four weeks after the end of the charged conspiracy. This evidence had virtually no genuine probative value and was unfairly prejudicial. Every theory for its admission either dissolves upon scrutiny or reduces to a pure propensity theory. The district judge was right the first two times when he ruled that the government had not yet shown grounds for admitting it, once before trial and once during trial.

The first time the government offered the evidence in trial, the district judge indicated that the defense had opened the proverbial door to the evidence by pointing out in cross-examination that the government had no evidence showing that Gomez was in possession of any cocaine during the charged conspiracy. That was the context of the judge's comment that the defense had opened the door by implying that the defendant was "pure as the new fallen snow." The majority gently calls the remark "infelicitous." It clearly indicates an inclination toward propensity that is prohibited by Rule 404(b). Yet the district judge refused to admit the evidence at that time because the government had not yet offered sufficient evidence that the user quantity of cocaine in the pocket actually belonged to Gomez. The district court was not troubled at that point by the lack of a legitimate purpose. But the majority recognizes that it would have also been error to admit the evidence at this point for the lack of a legitimate Rule 404(b) reason to admit it, slip op. at 8, and on this point, I agree.

The government eventually cured this insufficient evidence problem (or at least the district judge did not clearly err by finding that the evidence of the later possession of the user quantity was sufficient). When the government again offered the evidence, the district court tried to identify legitimate Rule 404(b) purposes. The court accepted the government's vague arguments and identified three non-propensity uses for the evidence: identity, absence of mistake, and knowledge. The majority explains correctly, in my view, that the Rule 404(b) evidence here had nothing to do with absence of mistake or knowledge. Slip op. at 10-11. The absence-of-mistake theory was wrong precisely because it was really a propensity theory in disguise. The cocaine could rebut the idea that the government was mistaken about Gomez only by showing that he has a propensity toward involvement with cocaine. Slip op. at 11. And in any event, the absence-of-mistake theory for Rule 404(b) evidence refers to the absence of a mistake on the part of the *defendant*, not the government investigators. The knowledge theory of admission was never developed and has no real basis here. So the majority and I agree that two of the three grounds given by the district court for exercising its discretion to admit the evidence were in fact erroneous.

The only remaining leg of the district court's now unstable three-legged stool for admitting this evidence is that it tended to show identity — that Gomez was the voice of "Guero" in the telephone intercepts. The majority describes the chain of inferences to show identity as "not particularly compelling." Slip op. at 18.

That's an understatement. The identity rationale for admitting the user quantity evidence is itself just a thin veil over what is really just propensity evidence. Neither the district court, the government, nor the majority has articulated that chain of inferences in a persuasive way that does not include sheer propensity. This use has the same flaw as the absence-of-mistake theory. It boils down to a pure propensity theory.

The best argument that can be made for the district court's admission of the evidence is that the cocaine was found in a house associated with one of the intercepted telephones used in arranging cocaine deliveries rather than in an unrelated location. The logic appears to be that because Gomez possessed the cocaine in a house associated with the conspiracy rather than in an unrelated location, the fact of possession becomes probative of identity rather than mere propensity. The majority seems to adopt this distinction when it recognizes that possessing cocaine at the same time in a location removed from the conspiracy would tell a juror nothing about whether Gomez was involved in the conspiracy. Slip op. at 14.

The problem is that the user quantity of cocaine discovered almost four weeks later simply has not been linked to the earlier distribution conspiracy by anything except that location. For the sake of argument, one can speculate that perhaps the user quantity was a leftover from an earlier delivery, but the same could be said of any user quantity. Possession of this small quantity says nothing probative about whether the possessor had any role in

the upstream large-scale distribution conspiracy. With-out a closer link between the user quantity in the pocket and the earlier conspiracy, the only inference that could be made to suggest that Gomez rather than Victor Reyes was on the phone calls is that it was Gomez *because* he was involved in some way with drugs. This is a pure propensity inference that Rule 404(b) forbids. A person's possession of a small user quantity of cocaine provides no useful information about that person's involvement in large-scale distribution, except through the prohibited inference of propensity.

*United States v. Brown*, 471 F.3d 802 (7th Cir. 2006), discussed in the majority opinion, is a good example of when evidence of other involvement with drugs may be probative of identity without depending on pro-pensity inferences, but it is readily distinguishable on decisive grounds. Brown's defense at trial was that he did not know the seller from whom he was charged with buying drugs and that the police had mistakenly identified him. The prosecution used Rule 404(b) evi-dence of Brown's prior drug dealings *with the same seller* to show that the identification of Brown was correct. This use of other drug activity was probative of identity because it showed that Brown had actually dealt with the person he claimed to have nothing to do with. The drug activity showed that Brown had a drug-dealing relationship with the seller and allowed the jury to draw an inference of identity based on Brown's relationship with the seller rather than the more general fact that Brown had some earlier involve-ment with illegal drugs. There is no comparable link

between the user quantity of cocaine here and the charged offenses or the issue of identification.

This would be a very different case if the police had found in Gomez's room a larger quantity of cocaine suitable only for distribution, or if they had found other evidence tied to distribution, such as scales, packaging material, etc. With such evidence from a later search indicating that Gomez was involved in cocaine distribution at the location where the large-scale deliveries had been made, the chain of inferences to show identity would be much shorter and more reasonable and would not depend solely on propensity. (In fact, the police did find distribution materials at the house, but they were in someone else's bedroom. That evidence could not be linked to Gomez.) Without a clearer link to cocaine distribution, as opposed to mere use, the Rule 404(b) evidence used against Gomez was simply too tenuous and too prejudicial to admit.

The majority correctly points out that we apply a deferential standard of review to Rule 404(b) questions and the related Rule 403 balancing inquiry, asking only whether the district court abused its discretion by admitting the evidence. In this troublesome area of the law, however, we have emphasized that we need to see "a principled exercise of discretion" by the district court. *United States v. Albiola*, 624 F.3d 431, 438 (7th Cir. 2010), quoting *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir. 1987) (reversing convictions affected by Rule 404(b) evidence). The majority and I agree that two of the three grounds given by the district court for

exercising its discretion to admit the evidence were in fact erroneous. When two of the three grounds relied upon for admission collapse under minimal scrutiny and the court has difficulty articulating a basis for the third, that ought to be a strong signal that the district court's exercise of discretion was not sound. Moreover, when the district court fails to show that it engaged in the Rule 403 balancing inquiry — here not mentioning the word "prejudice" even once — the record does not show a sound exercise of discretion to which we should defer.

In an effort to minimize the prejudice from the evidence, the majority also relies on the district court's limiting instruction. The court told the jury it could consider the later discovery of the user quantity of cocaine only "on the question of identity, absence of mistake or accident, and knowledge." As a general matter, one can question how useful such limiting instructions are when a jury might easily slide toward the forbidden propensity inference in its use of Rule 404(b) evidence. See generally *Bruton v. United States*, 391 U.S. 123, 135 (1968) (limiting instruction could not cure problems presented by defendant's inability to cross-examine declarant when co-defendant's confession is admitted; "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored"). In fact, the advisory note to Rule 403 expressly instructs

courts to consider "the probable effectiveness or lack of effectiveness of a limiting instruction."

It is true that in Rule 404(b) cases, we have often trusted the effectiveness of limiting instructions, though without necessarily giving the question close empirical attention. *E.g.*, *United States v. Denberg*, 212 F.3d 987, 994 (7th Cir. 2000) ("this court has held many times that limiting instructions are effective in reducing or eliminating any possible unfair prejudice from introduction of Rule 404(b) evidence," and collecting cases); see also *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008); *United States v. Moore*, 531 F.3d 496, 500 (7th Cir. 2008).

In fact, however, there is good reason to question the effectiveness of limiting instructions when it comes to Rule 404(b) evidence, particularly in a case like this. Social science experiments using mock jurors find that jurors are more likely to convict when they have heard evidence of a prior conviction and that limiting instructions are often ineffective at guiding jurors' use of such evidence. *E.g.*, Edith Greene & Mary Dodge, *The Influence of Prior Record Evidence on Juror Decision Making*, 19 L. & Hum. Behav. 67, 76-77 (1995) (finding that judge's limiting instructions were ineffective in guiding jurors' use of prior record evidence, and collecting prior research reaching similar conclusions); Kerri L. Pickel, *Inducing Jurors to Disregard Inadmissible Evidence: A Legal Explanation Does Not Help*, 19 L. & Hum. Behav. 407 (1995) (finding varied juror responses to limiting instructions, including instructions where explanation "back-

fired"); *see also* J. Alexander Tanford, *The Law and Psychology of Jury Instructions*, 69 Neb. L. Rev. 71, 86-87 (1990) (citing earlier experiments that "all show similar results"); Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 Sci. 1124, 1124-25 (1974) (concluding that individuals do not properly adjust their probability estimates upon receiving new information, especially when original information resembles issue in question). Particularly troubling for this case are studies that show jurors are especially influenced by evidence of other bad acts that resemble the case before them. See Joel D. Lieberman & Jamie Arndt, *Understanding the Limits of Limiting Instructions: Social Psychological Explanations for the Failures of Instructions to Disregard Pretrial Publicity and Other Inadmissible Evidence*, 6 Psychol. Pub. Pol'y & L. 677, 686-87 (2000), citing R. L. Wissler & M. J. Saks, *On the Inefficacy of Limiting Instructions*, 9 L. & Hum. Behav. 37 (1985). Limiting instructions work best when the instructions arouse jurors' suspicions as to the problems with considering such evidence (*e.g.*, reliability). *Id*. at 688.

This research about limiting instructions in general and Rule 404(b) limiting instructions in particular should at least make us cautious about putting too much confidence in those instructions. At a minimum, though, for limiting instructions to work the jury must be able to understand the instruction. To return to the specific problems in this case, the limiting instruction the court gave was surely a confusing mystery to the jury. The majority and I agree that two-thirds of the instruction was simply wrong. The Rule 404(b) evidence

had no relevance to any supposed absence of mistake or to Gomez's knowledge. Even the identity theory that the majority uses to salvage this conviction was itself "not particularly compelling" and invited the prohibited propensity inference. We have said that a good test for Rule 404(b) evidence is to see if the district judge can actually explain its permissible use without leaning on sheer propensity. *United States v. Miller*, 673 F.3d 688, 701-02 (7th Cir. 2012). Where the district judge, the prosecution, and the majority have had so much trouble articulating how the Rule 404(b) evidence related to the legitimate issue of identity, we should not assume that jurors would have managed to do so. Under these circumstances, we should not take any comfort from the usual limiting instruction.

In his comments on the Rule 404(b) evidence, the district judge simply never came to grips with how the presence of a user quantity of cocaine in Gomez's room nearly four weeks after the end of the large-scale distribution conspiracy made his participation in the conspiracy any more likely without relying on general propensity. I would find that the admission of the Rule 404(b) evidence was an abuse of discretion and would reverse and remand for a new trial.